**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **COSMAS G. STRATIGOS** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) No. 09 C 1923 |
| v. | ) |
| | ) Judge Joan H. Lefkow |
| **AMERICAN AIRLINES, INC.** | ) |
| | ) |
| **Defendant.** | ) |

## OPINION AND ORDER

Cosmas Stratigos, of Greek national origin, filed a complaint against his former employer, American Airlines, Inc. ("American"), alleging discrimination based on national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 *et seq.* Before the court is American's motion for summary judgment. For the reasons set forth below, the motion [#55] is granted.

## BACKGROUND

**I.  Stratigos's Employment History**

Stratigos worked as a fleet service clerk for American at O'Hare International Airport from 1987 until his termination on March 20, 2006. Fleet service clerks perform a variety of duties, including cleaning aircraft, loading and unloading aircraft, servicing lavatories, and unloading cargo and mail.

Prior to his termination, Stratigos's personnel file did not contain any disciplinary records. Human Resources employee Daniel Procknow and airport service manager Diana Henao testified that Stratigos was qualified for his position at the time of termination. In 1998, however, he had been found working out at a hotel gym during work hours, which led to his

termination. Stratigos was reinstated nine days later. He claims that he was working out during his lunch hour and that others doing the same thing were not terminated. He filed a charge of discrimination based on national origin with the Illinois Department of Human Rights because he was the only one singled out for working out in the gym. Pursuant to a settlement agreement in which Stratigos agreed to withdraw his charge, he received an oral apology from Duke Schneider, a supervisor whose conduct during the investigation of the gym incident Stratigos found objectionable. Procknow was aware of this situation.

## II.     Relevant Laws and American Policies

American and its employees are subject to federal regulations regarding the disposal of food that arrives on international flights. These regulations provide that regulated garbage shall not be removed from an aircraft unless it is in tight, leak-proof receptacles. American has established its own policy on regulated garbage, which defines regulated garbage to include food that was available on international flights but not consumed. Dairy, milk, cream, and ice are given as examples of regulated garbage. Under American's policy, regulated garbage is to be placed in specifically designated plastic bags or leak proof containers and either sterilized or incinerated. As he came into contact with regulated garbage in his position as a fleet service clerk, Stratigos completed training on American's regulated garbage policy on April 21, 2003.[1]

## III.    The Milk Incident

On March 14, 2006, Stratigos was not assigned to the international terminal. He was observed there, however, by two U.S. Customs and Border Protection Agriculture Specialists as he was leaving the jet bridge of an aircraft that had arrived from London, England with another

---

[1] Stratigos claims that the policy was not followed in practice.

2

fleet service clerk, Rajan Thomas.[2]  Stratigos was carrying newspapers, a magazine, and three half pints of fresh cold milk.  Stratigos and Thomas proceeded to a nearby lavatory truck, where Stratigos placed the milk bottles on a seat.  James Luebker, one of the U.S. Customs agents, approached Stratigos and Thomas about their apparent infraction of the regulated garbage regulations.  Stratigos and Thomas were asked to draft statements to explain the removal of the milk bottles, which they did.  The incident was reported and a meeting was held soon thereafter.  Luebker attended, as did American customer service managers Joanie Avery, Kathleen Guerrero, Jim Meyers, and Sean O'Brien.  The incident was discussed, as was the fact that Thomas had previously been found eating onboard an international arrival.  Luebker informed the others that American would be issued a violation for failure to comply with federal regulations.

After the meeting with Luebker, O'Brien or Guerrero notified Henao that Stratigos had been caught by U.S. Customs removing milk from an international arrival.  O'Brien then informed Stratigos that a 29f investigation would be conducted.  A 29f investigation is governed by the fleet service clerks' union contract and provides for a conference at which the clerk is allowed to be represented by a union steward.  During the conference, the supervisor reads the clerk the contract's 29f provision and American Rule 16, which provides that misrepresentation or falsification of facts is not allowed.  The supervisor and union steward then ask the clerk questions regarding the incident under investigation.

Stratigos told O'Brien a story that was consistent with his written statement to Luebker: He went to the international terminal to find a coworker to discuss a personal matter.  While on a jet bridge, he noticed milk bottles and a spill near the door of the aircraft parked at that gate.  He

---

[2] Thomas was assigned to clean the lavatories of the aircraft in question.

boarded the aircraft to get paper towels from the lavatory, cleaned up the spill, and then threw the paper towels away in the lavatory. He then took the bottles of milk with him, planning to put them in the sink at gate K19.[3] Stratigos claimed not to be a milk drinker. He did not report the spill to the environmental coordinator, as required for unknown spills that may pose a danger, because he addressed the issue as quickly and effectively as possible.

O'Brien relayed the results of the 29f conference to Henao. The two of them contacted American's Human Resources department and decided to withhold Stratigos with pay pending the outcome of further investigation into the incident. As part of this investigation, Craig Martin, who met the aircraft at issue upon its arrival, provided a statement. He reported that he performed customary perfunctory checks of the aircraft after its passengers had deplaned and did not notice any milk or other foodstuffs left anywhere except onboard the aircraft. O'Brien did not personally speak to Martin or any other potential witness, including Thomas, or check the aircraft lavatory bathroom for wet paper towels that could have potentially substantiated Stratigos's story.

O'Brien and Henao ultimately determined that Stratigos should be terminated. They consulted with Human Resources employees Procknow and Kim Roush in coming to this decision. They concluded that Stratigos had been untruthful in his story. Their reasons included that (1) it was unusual for milk bottles to be found on a jet bridge, (2) there was no supporting evidence that someone had put the milk on the jet bridge, (3) it was unlikely that Stratigos would be taking the milk such a long distance to gate K19 to dispose of it, (4) there was no explanation

---

[3] Gate K19 is in one of O'Hare's domestic terminals. Stratigos was scheduled to work that day at gate K7.

4

for why Stratigos would not dispose of the milk in the aircraft lavatory when disposing of the paper towels he used to clean up the spill, and (5) it seemed questionable that Stratigos would travel to the international terminal from his work area to look on a randomly selected plane for a coworker as he claimed.

The decision to terminate Stratigos was memorialized in a final advisory on March 20, 2006. The document recounted the milk incident, Stratigos's claimed explanation, and American's conclusion that this explanation was not plausible. It continued:

> In the end, the Company has concluded that you not only demonstrated a lack of good judgment and violated US Customs and USDA regulations; you specifically violated American Airlines Rules and Regulations #10, #16, #17, and #34, which state:
>
> Rule #: 10     "Be sure to observe security and smoking regulations in all areas in which you work or visit."
>
> Rule #: 16     "Misrepresentation of facts or falsification is prohibited."
>
> Rule #: 17     "Work carefully. Observe[ ] posted or published regulations."
>
> Rule #: 34     "Dishonesty of any kind in relations to the Company, such as theft or pilferage of Company property, the property of other employees or property of others entrusted to the Company, or misrepresentation in obtaining employee benefits or privileges will be grounds for dismissal and where the facts warrant, prosecution to the fullest extent of the law. Employees charged with a criminal offense on or off duty may be immediately withheld from service. Any action constituting a criminal offense, whether committed on or off duty, will be grounds for dismissal."

Ex. 5 to Ex. C to Def.'s Statement of Facts.

Stratigos filed a discharge appeal grievance through his union. Bernard DeSena, formerly a vice president for American in charge of its operations at O'Hare, decided discharge appeals, including that of Stratigos. DeSena testified that, in making decisions about

5

reinstatement, he considered an employee's honesty, including whether the employee's story was believable and in line with the conclusions of American's investigation into an incident. During Stratigos's hearing, which was attended by Stratigos, DeSena, Procknow, and three union representatives, Stratigos reiterated his version of the milk incident. Like the others who considered this story, DeSena did not find it credible. He was not convinced because no one else observed milk on the jet bridge and Stratigos could have found somewhere closer to dispose of the milk if he truly believed it posed a potential danger. DeSena also concluded that Stratigos should not have been on the jet bridge as it was not his assigned work area or near it and that it was improper for Stratigos to remove regulated garbage from an international arrival. Having found that Stratigos had been untruthful during the discharge appeal hearing, violated American's regulated garbage policy, and stole milk from the aircraft, DeSena did not reinstate Stratigos. DeSena testified that if Stratigos had been honest during the hearing, he likely would have been reinstated. DeSena also agreed that Stratigos was qualified for his position at the time of his termination.

**IV.    Claimed Basis for Stratigos's Discrimination Claim**

Although Stratigos admits that his national origin was never mentioned during the discipline process related to his termination, he claims that Meyers, one of the customer service managers who initially was informed of the milk incident by Luebker,[4] made derogatory comments about Stratigos's Greek heritage. Specifically, Stratigos testified that Meyers, who sometimes supervised him, called him a "Greek piece of shit" and a "Greek faggot," commented

---

[4] On the day of the milk incident, Meyers was the customer service manager for the international terminal.

6

"Never bend over in front of a Greek," asked Stratigos "How does your ass feel today?" and smiled strangely at Stratigos following the milk incident. Stratigos admits that he never complained to American's Human Resources Department or any other American employee about Meyers's alleged comments. Stratigos believes Meyers was involved in his termination, although the only evidence he has of this is Meyers's presence at the meeting with Luebker.

At some point after the discharge appeal decision was made, DeSena retired and was replaced by Art Pappas, who like Stratigos is of Greek national origin. Stratigos testified that he told Pappas that he was discriminated against, although he never specified that it was on the basis of national origin. Pappas subsequently reviewed Stratigos's termination but concluded that he could not change the decision.

## V. Comparators

Stratigos has identified six American employees who he claims are similarly situated to him, although not Greek.[5] Thomas was the fleet service clerk who was with Stratigos at the time of the milk incident. He was not investigated or disciplined for any role he may have played in this incident. Thomas had previously been found eating on an international flight by U.S. Customs. His personnel record reveals that this incident was discussed with a supervisor at the time of the milk incident, but no further details about the prior incident are provided. There is no indication that O'Brien or Henao were involved as supervisors or decisionmakers.

Ramon Selvas, another fleet service clerk, was found stealing newspapers off an aircraft, which is a violation of Rule 34. Guerrero discussed the incident with Selvas, after which Selvas

---

[5] Stratigos does not provide any support for his assertion that these six individuals are not of Greek origin. The court will assume without deciding that they are not Greek for purposes of resolving this motion.

advised her that he would not remove newspapers from an aircraft again. There is no indication that O'Brien or Henao were involved in reviewing this incident.

Mark Michalick, a crew chief for the fleet service clerks, was caught with salads from an international arrival. Unsolicited, a catering employee working the international arrival had given these salads to Michalick. This violated Rule 34 and federal regulations and subjected American to a fine. Michalick was reprimanded, receiving a second advisory. Henao admits to having supervised Michalick but did not recall issuing any advisories to him. Michalick's personnel file identifies an unrelated customer service manager and an unrelated airport service manager as the decisionmakers in this case.

John Gacek was arrested in 2003 for what appears to be contempt of court. An arrest violates Rule 34. A first advisory was issued. In February 2006, Gacek was terminated for fraud in connection with an injury on duty in violation of Rules 16 and 34. There is no indication that O'Brien or Henao were involved as supervisors or decisionmakers in either of these incidents.

Fleet service clerks Tom Beam and Patrick Peel were terminated for timecard fraud in violation of Rules 16 and 34. Procknow was involved in the decision, but there is no indication that O'Brien or Henao were involved. Beam's and Peel's appeals were denied, but they were subsequently reinstated as part of a larger settlement with the Transport Workers Union addressing clock in and clock out procedures for fleet service clerks.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings

and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the nonmoving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one that might affect the outcome of the suit. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

Stratigos may establish national origin discrimination under Title VII using the direct or the indirect method of proof. *Scaife* v. *Cook County*, 446 F.3d 735, 739 (7th Cir. 2006) (citing *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802–04, 93 S. Ct. 1817, 36 L. Ed. 2d 688 (1973)). American argues that it is entitled to summary judgment because Stratigos has not presented direct or circumstantial evidence of discrimination under the direct method of proof and, alternatively, because Stratigos cannot establish a *prima facie* case of discrimination under the indirect method of proof. Even if Stratigos can establish a *prima facie* case, American argues, he has not produced any evidence of pretext. Stratigos argues that genuine issues of

9

material fact exist under both the direct and indirect methods of proof such that summary judgment is inappropriate.

I.    **The Direct Method of Proof**

Under the direct method, Stratigos can prove his case through direct evidence (such as an admission by the decisionmaker that his actions were based on unlawful animus) or through circumstantial evidence, "i.e., evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Rogers* v. *City of Chicago*, 320 F.3d 748, 753–54 (7th Cir. 2003) (internal citations omitted). Stratigos claims that there is enough circumstantial evidence of intentional discrimination, consisting of Meyers's derogatory comments, O'Brien's cursory investigation of the milk incident, and O'Brien's denial of Meyers's involvement in the termination decision, to withstand summary judgment.

The only evidence that Meyers was in any way involved in the milk incident comes from Luebker's report that Meyers was one of four customer service managers initially informed of the incident. From this and O'Brien's statement during his deposition that the meeting with Luebker lasted about an hour, Stratigos posits that the decision to terminate him was made with Meyers's influence at this meeting. O'Brien denies ever speaking with Meyers about the decision. Luebker's report only places the two in the same room. Henao, Procknow, and DeSena testified that Meyers was not involved in the decision to terminate Stratigos. While Stratigos believes that Meyers was involved, there is no admissible evidence that the decisions to terminate Stratigos and not to reinstate him were made during the initial meeting at which

10

Meyers was present.[6] Stratigos's "stated beliefs cannot create genuine issues of material fact when those beliefs lack a foundation of personal knowledge." *Montgomery* v. *Am. Airlines, Inc.*, 626 F.3d 382, 395–96 (7th Cir. 2010).

Because Meyers was not a decisionmaker, Meyers's derogatory comments are relevant only if his discriminatory animus was a proximate cause of Stratigos's termination. *See Staub* v. *Proctor Hosp.*, --- U.S. ----, 131 S. Ct. 1186, 1194, --- L. Ed. 2d ---- (2011). Stratigos has presented comments that establish Meyers's discriminatory animus, but there is no evidence in the record to support a finding that Meyers's animus was a proximate cause of Stratigos's termination. No reference to Stratigos being Greek was made during the course of the termination proceedings, nor did Stratigos ever raise this as an issue before filing his discrimination charge. The only evidence of any interaction between the decisionmakers and Meyers is the meeting with Luebker at which both Meyers and O'Brien were present. No evidence has been submitted that O'Brien or the other decisionmakers were even aware of Meyers's derogatory comments at any point while considering disciplinary action for the milk incident or Stratigos's discharge appeal. Stratigos relies solely on speculation in arguing that Meyers influenced O'Brien to terminate Stratigos because he is Greek. "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg* v. *Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995). As Stratigos fails to present evidence sufficient to demonstrate that Meyers's animus toward Greeks was a proximate cause of his termination, his claim of discrimination must fail

---

[6] Stratigos admitted during his deposition that he did not know whether Meyers was involved in the decision to terminate him. Ex. C to Def.'s Statement of Facts at 127:19–22. Meyers appears not to have been deposed in this case.

under the direct method.

## II. The Indirect Method of Proof

Under the indirect method, Stratigos bears the initial burden of producing evidence to sustain a *prima facie* case. To establish a *prima facie* case of national origin discrimination, Stratigos must demonstrate that (1) he is a member of a protected class; (2) he was meeting American's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than other similarly situated employees not of his protected class. *Montgomery*, 626 F.3d at 394. If he meets this burden, American must then articulate a legitimate, nondiscriminatory reason for its action. *Id.* If American offers a legitimate, nondiscriminatory reason, the burden shifts back to Stratigos to show that the reason proffered by American was a pretext for discrimination. *Id.*

To be similarly situated, employees must be "directly comparable in all material respects." *Hudson* v. *City of Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004). Relevant factors include whether the employees reported to the same supervisor, were subject to the same standards, and possessed comparable qualifications. *Patterson* v. *Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). A similarly situated employee must also possess a "comparable set of failings" to the plaintiff. *Burks* v. *Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). The similarly-situated requirement "is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees – distinctions can always be found in . . . performance histories or the nature of the alleged transgressions." *Humphries* v. *CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). Indeed, the inquiry is flexible and requires a court to

"ask whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of . . . retaliation." *Id.*

In the termination context, however, to be similarly situated, the Seventh Circuit has required that the comparator "have been treated more favorably *by the same decisionmaker* that fired [the plaintiff]." *Ellis* v. *United Parcel Serv., Inc.*, 523 F.3d 823, 826 (7th Cir. 2008) (emphasis added); *see also Little* v. *Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004) ("A similarly-situated employee must have been disciplined, or not, by the same decisionmaker who imposed an adverse employment action on the plaintiff."); *Radue* v. *Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000). "Different decisionmakers may rely on different factors when deciding whether, and how severely, to discipline an employee." *Id.* Stratigos has identified six employees as potential comparators, all of whom engaged in some conduct that violated Rule 34,[7] one of the rules American concluded Stratigos violated. There is no indication that any of the decisionmakers in Stratigos's case were also decisionmakers for the incidents involving Thomas, Selvas, Gacek, or Michalick. Although Henao testified that she was generally involved in disciplining the fleet service clerks and Procknow admitted to being involved in most termination cases, such generality is not enough to create an issue of fact. This is especially the case where Henao and Procknow have denied involvement in the identified cases and Stratigos has not presented any specific evidence to the contrary. Henao was at one time Michalick's supervisor, but there is no evidence that she played any role in the decision to

---

[7] Henao, O'Brien, and Procknow testified that taking food off a plane, eating on a plane, taking newspapers off a plane, and stealing time violate Rule 34.

only reprimand and not terminate Michalick for his receipt of salads from an international arrival.[8] In fact, Michalick's personnel record indicates that a different airport service manager was involved in the decision. While the treatment of these identified individuals may seem inconsistent with that of Stratigos, because the decisions were made by different managers who may have relied on different factors in doling out discipline, Stratigos cannot use them as comparators to show that he was treated differently.[9] *See Robinson* v. *Int'l Truck & Engine Corp.*, No. 07 C 5161, 2009 WL 901013, at *7 (N.D. Ill. Mar. 31, 2009) ("Plaintiff has not cited, nor has the Court in its own research located, any case in which employees were found to be similarly-situated when the evidence clearly showed that the pertinent employment decisions concerning the plaintiff and the proposed comparator were made by different managers or supervisors.").

Procknow was involved in the decision to terminate Beam and Peel, having alerted other supervisors to potential timecard fraud. Because Beam and Peel received the same treatment as Stratigos for a violation of Rule 34, however, they are not valid comparators. Although Beam and Peel were later reinstated, reinstatement was the result of an agreement between American and the Transport Workers Union that encompassed broader issues regarding how the company dealt with aircraft mechanic employees and fleet service clerks. Their reinstatement was not a discretionary decision comparable to that DeSena made in reviewing Stratigos's discharge

---

[8] In her deposition, Henao testified that she did not believe she ever issued Michalick an advisory or took disciplinary action against him.

[9] Stratigos alludes to the fact that Meyers may be a common decisionmaker, but he cites to no evidence that Meyers had any involvement in disciplining his identified comparators. Further, as the court has concluded above, there is also no evidence that Meyers was a decisionmaker in Stratigos's case.

14

appeal. In fact, Beam's and Peel's discharge appeals were denied. That the union succeeded in obtaining their reinstatement is irrelevant to whether they were treated more favorably than Stratigos by a common decisionmaker. Thus, as Stratigos has not demonstrated that similarly situated employees of non-Greek origin were treated more favorably than him, he cannot establish a *prima facie* case of discrimination under the indirect method of proof.

As there is no genuine issue of material fact regarding national origin discrimination under either the direct or indirect method, American's motion for summary judgment will be granted.

## CONCLUSION AND ORDER

For the reasons discussed above, defendant's motion [#55] is granted. The clerk is instructed to enter summary judgment in favor of the defendant. The case is terminated.

Dated: May 11, 2011　　　　　　　　　　　　Enter:_____
　　　　　　　　　　　　　　　　　　　　　　　　JOAN HUMPHREY LEFKOW
　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge